SIGNED this 18th day of January, 2012

_____
Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
| JESSE GERALD HEINZ and VICTORIA MICHELLE HEINZ, | No. 10-52964 Chapter 7 |
| Debtors. | |
| MARK FORSYTH and KIMMERLY LINDSAY, | |
| Plaintiffs, | |
| vs. | Adv. Pro. No. 11-5009 |
| JESSE GERALD HEINZ, | |
| Defendant. | |

# M E M O R A N D U M

Appearances:

| | |
|---|---|
| Mark S. Dugger, Esq. | Fred M. Leonard, Esq. |
| 625 East Elk Avenue | 27 Sixth Street |
| Elizabethton, Tennessee 37643 | Bristol, Tennessee 37620 |
| *Attorney for Plaintiffs* | *Attorney for Defendant* |

**Marcia Phillips Parsons, Bankruptcy Judge.**    In this adversary proceeding, plaintiffs Mark Forsyth and Kimmerly Lindsay seek a judgment against the debtor Jesse Gerald Heinz and a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A).    Plaintiffs claim that the Debtor fraudulently misrepresented that his construction company Masters Touch Custom Homes, Inc. was an insured and licensed general contractor in order to induce them to enter into a construction contract that left them with a fatally defective, partially constructed house.    A trial in this proceeding was held on October 19, 2011.    As discussed below, the court finds in favor of the Plaintiffs and concludes that a nondischargeable judgment in the amount of $179,420.71 plus attorney's fees and costs should be entered in their favor.    This is a core proceeding. See 28 U.S.C. § 157(b)(2)(I).

I.

Sometime in 2006, the Plaintiffs, residents of Delray Beach, Florida, purchased a lot on Watauga Lake in the Horseshoe Cove subdivision located in Carter County, Tennessee.    The Plaintiffs planned to build a log house on the site to be used first as a vacation home and ultimately as a retirement home.    While visiting the area over Memorial Day weekend in 2008, the Plaintiffs saw a sign for Masters Touch in front of a log house being constructed by the company.    Pleased with the outward appearance of the house, the Plaintiffs telephoned the number for Masters Touch on the sign, talked with the Debtor, and arranged to meet to discuss the possibility of Masters Touch building a log house on their lot.    During this initial meeting, the Plaintiffs informed the Debtor that they had been pre-approved for a construction loan with Bank of America, and that the bank would require their builder to complete a builder's application, which would require proof of licensing and insurance and information regarding the number of houses the contractor was currently building and had built in the past, along with credit references.    According to Ms. Lindsay, the Debtor responded that these requirements would be no problem.

Later that same weekend, at the Debtor's suggestion, the Debtor's father gave the Plaintiffs a tour of the log house being built by Masters Touch that the Plaintiffs had admired.    With a construction cost of over $700,000, the house was more expensive and significantly larger than what the Plaintiffs planned to construct, but they were impressed with what they saw.    They gave a copy of the construction plans for their planned house to the Debtor, who indicated that he would like to

2

have them reviewed by an architect.

Upon returning to Florida, the Plaintiffs contacted a few individuals in order to obtain references for the Debtor.  Not hearing anything that would deter them, the Plaintiffs began communicating with the Debtor by telephone and email regarding various modifications to the construction plans and a proposed project budget.  On June 18, 2008, the Plaintiffs wired $5,000 to the Debtor to reserve their construction spot and for various preliminary costs, including architect fees, permits, and surveys.  When Bank of America requested a copy of the parties' construction contract, the Plaintiffs contacted the Debtor and he sent them a proposed contract.  The first page of the contract had a letterhead setting forth the Masters Touch name, the Debtor's name, an address, a telephone number, and  the words "Licensed and Insured."  Under a heading on the first page entitled "Company Information," two bullets set forth the following information: "General contractors license number 00050551" and "Workers compensation and General liability Insurance through Green[e]ville Insurance Agency."  The contract specified the construction of a two-story, 2,448 square foot log house, with 1,632 square feet of decking at a total estimated construction cost of $342,700.  The contract provided that all work would meet or exceed all local building codes, and would be completed "in approximately 12 months, but can be delayed because of weather, delivery dates, etc."  Additionally, the contract set forth a budget listing the estimated cost of each aspect of the construction, as well as a draw schedule for payment based on the progress of the project.

On August 28, 2008, the parties executed the proposed contract, and the Plaintiffs submitted it to Bank of America, which requested a different draw schedule than the one provided for in the contract.  Consequently, the Debtor prepared a new contract with the requested draw schedule, but which was otherwise identical to the first.  The parties signed the second agreement on October 2, 2008.

The Debtor commenced construction of the house on October 29, 2008.  Because of the Plaintiffs' distance from the construction site, the parties communicated primarily by email, with the Debtor on occasion sending the Plaintiffs progress pictures of the project.  The Plaintiffs first visited the construction in July 2009 and were surprised and disappointed that so little work had been done.  The Plaintiffs next visited the house over Labor Day weekend in September 2009.  The exterior logs had been installed on the house by this visit, but it was clear that the house would not

3

be completed by the one-year date provided for in the contract.  The Plaintiffs expressed their concern about the slow construction to the Debtor.  He assured them that he wanted to complete the construction and provided to them a revised work schedule, which contemplated a January 2010 completion, with a detailed list of the work that would be completed in the intervening months.  Based on this revised schedule, the Plaintiffs made arrangements with their lender to extend their construction loan.

Over Thanksgiving weekend 2009, the Plaintiffs returned to the construction site.  Contrary to the revised work schedule, the roofing had not been completed, the windows and doors had not been installed, the deck had not been built, and the staining had not begun.  Dissatisfied with the lack of progress, the Plaintiffs contacted five other builders.  According to Ms. Lindsay, the consensus of the other builders was that the house had a long way to go and that the Debtor should be fired, which the Plaintiffs did on November 30, 2009, with a December 11, 2009 letter confirmation.  By this time, the Plaintiffs had paid Masters Touch $185,279.  By agreement of the parties, the Debtor refunded to the Plaintiffs $25,000, monies not yet expended by Masters Touch, such that the total payment to Masters Touch was $157,420.71.[1]  With the refund, the Plaintiffs applied approximately $22,000 to outstanding bills for materials, services, and labor in connection with the project.

The Plaintiffs never completed construction of the house.  According to the Plaintiffs, every potential builder that they contacted wanted $250,000 or more to finish the house, but the Plaintiffs only had $160,000 left on their construction loan.  Also, each builder contacted indicated that he would not guarantee the construction or give a warranty because he had not done the initial work on the project.  Moreover, the Plaintiffs' lender Bank of America required a waiver of liens executed

---

[1] The $185,279 and $157,420.71 amounts were taken from the parties' stipulations in their joint pretrial statement; a copy of the $25,000 check was trial Exhibit No. 26.  A quick mathematical calculation demonstrates that the math is incorrect ($185,279 - $25,000 = $160,279, not $157,420.71).  Moreover, other filings in the case in connection with the Debtor's summary judgment motion indicate that the total paid to Masters Touch, including the bank draws and the initial $5,000 payment by the Plaintiffs, was $182,410, so the court is unclear as to the source of the $185,279 amount.  Nonetheless, because the parties stipulated to this amount, it will be utilized by the court.

by the Debtor or a 90-day delay before it would agree to another builder resuming construction. The Plaintiffs forwarded a lien waiver to the Debtor but they never heard back from him.

Notwithstanding the Debtor's contractual representations regarding insurance and licensure, the Plaintiffs subsequently learned that the truth was not so straightforward.  As to insurance, Masters Touch did obtain general liability and workers compensation coverage on June 25, 2008, prior to the execution of the first contract with the Plaintiffs on August 28, 2008.  However, the policy was canceled for nonpayment on September 25, 2008, before the second contract was signed and before construction commenced.  There was no indication that Masters Touch ever renewed this policy.  Moreover, Masters Touch had a history of obtaining similar insurance policies and then losing coverage for nonpayment.  Between 2004 and 2008, Masters Touch had 12 different insurance policies, all of which had expired due to the company's failure to maintain the premium.

As to licensure, Masters Touch similarly had a checkered history, with three gaps in its general contractor license after it first became licensed in 2003.  With respect to the Plaintiff's contract, Masters Touch was licensed when the Debtor first met the Plaintiffs and advised them that it would be no problem to comply with their lender's requirements for a contractor.  However, shortly thereafter, on June 1, 2008, Masters Touch's contractor license expired and was not renewed by the state licensing board until October 7, 2008, after the Debtor sent a request for renewal on September 2, 2008.  Thus, Masters Touch was not licensed when each of the two contracts with the Plaintiffs was executed, although its license was in place when construction actually began.

With respect to the October 7, 2008 license renewal, the Debtor did not fully disclose all of Masters Touch's liabilities in the financial statement that he filed to obtain the renewal. Specifically, he failed to list a 2007 state tax lien that totaled $8,271.76 at the time of trial and numerous income tax liabilities, although the exact amount of these liabilities as they pertained to Masters Touch was not established.  The evidence further indicated that Masters Touch's corporate status had been administratively dissolved by the Tennessee Secretary of State in 2004, such that the Debtor had to reinstate the status in order to renew Masters Touch's contractor license in October 2008.

More importantly, however, Masters Touch was never licensed in an amount sufficient to

build the Plaintiffs' house. At all times, its contractor license had a monetary limit of only $150,000. Masters Touch had sought initially a $250,000 limit when it applied for licensure in 2003, but was only granted the $150,000 limit. In 2004, Masters Touch requested a $500,000 monetary limit, but its limit remained at $150,000 after the company failed to submit requested financial statements to the Tennessee Board for Licensing Contractors.

On October 8, 2010, the Plaintiffs filed suit against Masters Touch and the Debtor in the Circuit Court for Carter County, Tennessee, alleging breach of contract, fraud, conversion, breach of implied warranties, and violations of the Tennessee Consumer Protection Act. That action was stayed when the Debtor and his wife filed a voluntary petition for bankruptcy relief under chapter 7 on November 17, 2010. The Plaintiffs thereafter timely commenced this adversary proceeding, seeking a judgment against the Debtor and asserting nondischargeability under § 523(a)(2)(A) of the Bankruptcy Code, as well as § 523(a)(4) and (6). On October 5, 2011, this court entered an order granting the Debtor partial summary judgment as to the latter two claims.

At the October 19 trial in this action, Ron Corum, a civil engineer with 27 years of structural experience, as well as the holder of both a contractor's and home inspection license, testified on behalf of the Plaintiffs and submitted a written report regarding his structural evaluation of the partially constructed log house. Mr. Corum found numerous deficiencies both as to the foundation and framing of the structure. After describing in detail these deficiencies, the report concluded:

> Our evaluation of the structure was completed with the results of poor condition and structurally unsound. The 14' tall 6" poured concrete walls are not adequate to support the loads of the home or its soil hydrostatic pressures being applied horizontally. The crawl space framing lacks proper vertical support and footer support. The basement framing has racked enough that the ability to support the loads above has been compromised. The first floor and roof framing is lacking the secure element to prevent the building from fall during a severe storm. These issues are significant enough to only recommend the structure be completely demolished and rebuilt from the ground up.

In his oral testimony, Mr. Corum explained that the house was only 25% complete, and that the cost to repair the foundation alone would range from $75,000 to $150,000, such that the repair cost would be greater than what the structure was worth. Mr. Corum opined that because of the steep grade of the lot a different foundation should have been used. He attributed the structure's problems to poor workmanship or possibly a lack of oversight or of experience, noting that a lot of issues had

6

been missed.

Also testifying on behalf of the Plaintiffs was Amos Halava, a licensed general contractor. He testified that there were several problems with the construction, including that the house had not been constructed in accordance with the architectural plans, the lumber had not been run the correct way for framing, and the walls were not set on footers. In his opinion, the house could not be repaired. Mr. Halava stated that in order for him to provide a warranty for the structure, he would have to start from scratch. He estimated the cost of rebuilding the house after demolition of the present structure at $459,432.60.

The Debtor testified on his own behalf. He stated that he formed Masters Touch in April 2003 and was its president and owner. The Debtor explained that he got into the construction business because his father had owned a construction company previously and that he personally had started building houses in 1999 after he moved to Tennessee. The Debtor noted that at the beginning of his career he did a lot of dry-ins for log houses, and then began building spec houses.

As to the Plaintiffs' construction, the Debtor testified that construction was delayed because of weather issues and because he had three knee surgeries due to a torn ACL, although one surgery took place in approximately August 2008 before construction on the Plaintiffs' house commenced. The Debtor indicated that he had planned to be on site as a foreman but was not able to do so because of his surgeries. He added that he had a great deal of employee turnover during this time, necessitating the hiring of a number of substitute workers.

According to the Debtor, the Plaintiffs never asked him about his contractor license or expressed any dissatisfaction with his work, other than that it was taking too long. The Debtor denied making any false or misleading statements to the Plaintiffs or doing anything to deceive them, and stated it had been his intention to complete the house. The Debtor disputed that the house had structural problems serious enough to warrant complete demolition of the building, although he did acknowledge that some beams were needed for reinforcement of the framing. In the Debtor's view, the house had been in good condition when his services were terminated.

The Debtor testified that the Plaintiffs' house was Masters Touch's last project, but that he subsequently constructed a house under his individual name. Thereafter, he worked as a

7

subcontractor doing construction work for which he did not need a license.  At the time of trial, the Debtor had been unemployed for three months.

Also testifying on behalf of the Debtor were Paul Phillips and Ernest Bass, two individuals who were familiar with the Debtor's character for honesty based on their prior employment of the Debtor.  Each had known the Debtor less than two years, although both vouched for his honesty and excellent construction skills.

II.

Section 523(a)(2)(A) of the Bankruptcy Code provides in pertinent part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).  For purposes of this provision, false pretenses and false representations "encompass statements that falsely purport to depict current or past facts."  *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003) (citing *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)).  " 'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation."  *Id.* (citing *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)).  "Actual fraud 'consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another–something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."  *Id.* (citations omitted).

The Sixth Circuit Court of Appeals has held that in order for a debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A), "a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss."  *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir. 1998) (footnote omitted).  The plaintiff has the burden of proof which must be met by a

preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654 (1991).

Moreover, "exceptions to discharge are to be strictly construed against the creditor."  *In re Rembert*,

141 F.3d at 281 (citing *Mfr.'s Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.

1988)).

As set forth in the joint pretrial statement filed by the parties in this case, the Plaintiffs

contend the Debtor fraudulently misrepresented that Masters Touch was a licensed contractor when

the license was not valid, fraudulently represented Masters Touch was qualified to build a house for

$342,700, and fraudulently represented Masters Touch was insured when it did not have insurance.

Applying the first *Rembert* element, the evidence clearly established that the Debtor falsely

represented that Masters Touch was a licensed contractor and that he made this representation with

knowledge of its falsity or with gross recklessness as to its truth.[2]  Both contracts prepared by the

Debtor and signed by the parties on August 28, 2008, and October 2, 2008, stated in the heading for

Masters Touch that it was "Licensed and Insured" and provided a general contractor's license

number for Masters Touch.  Contrary to these representations, Masters Touch's license had expired

on May 31, 2008, and was not renewed until October 7, 2008.  The Debtor testified that he assumed

that he had a one-year window to renew an expired license and upon renewal the license would

relate back to the expiration date of the prior license.  While Tennessee law does permit contractors

to renew their licenses up to one year after expiration, *see* Tenn. Code Ann. § 62-6-116(g), there is

no authority for the proposition that the contractor remains licensed during this one-year period or

that renewal relates back.

Granted, Masters Touch's contractor license was in place prior to the actual commencement

of construction on October 28, 2008.  However, Masters Touch was never licensed in an amount

sufficient to build a house of the size contemplated by the parties' contract, a $342,700 structure.

---

[2] As explained in the court's October 5, 2011 memorandum opinion denying in part Debtor's
summary judgment motion, the corporate status of Masters Touch does not shield the Debtor from
individual liability to the extent he participated in the commission of a tort by Masters Touch. *See,
e.g., Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 821 (Tenn. App. 1995) (individual may be liable
for fraud or misrepresentation even when acting as an agent for a corporation); *Brungard v. Caprice
Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. App. 1980) ("An officer or director of a corporation who
commits or participates in the commission of a tort is likewise liable to third parties regardless of
the liability of a corporation.").

With its $150,000 monetary limit, Masters Touch was only licensed to construct buildings less than half the cost of the Plaintiffs' house. The Debtor was aware of this limitation because he had requested higher monetary limits on two occasions, both of which had been denied. While there was no evidence that the Debtor ever verbally stated that he or Masters Touch was licensed in any particular amount, the Debtor created the false impression that Masters Touch was licensed in an amount sufficient to build the Plaintiffs' house. He created this impression by stating that proof of licensure would be no problem, giving the Plaintiffs a tour of a $700,000 house being built by Masters Touch, and then sending them a contract that provided for the construction of a house with an estimated cost of $342,700, which contract stated that Masters Touch was licensed. The contract in particular was an implied representation of licensure in the contractual amount. When all of these foregoing facts are considered collectively it is clear that the Debtor either knowingly or recklessly created the false impression that Masters Touch was adequately licensed to build the Plaintiffs' house.

Additionally, the misrepresentations creating this false impression were material. *See In re Copeland*, 291 B.R. at 761 (a fraudulent and material misrepresentation is a "substantial inaccurac[y] of the type which would generally affect a lender's or guarantor's decision"). Ms. Lindsay testified that licensing was important to the Plaintiffs because it communicated the experience and training required to build the quality of house they expected to have constructed and that they would not have hired Masters Touch had they known it was not adequately licensed. This importance was demonstrated by the fact that the Plaintiffs addressed the licensing and insurance requirements in their first conversation with the Debtor.

The Debtor also misrepresented that Masters Touch was insured. As previously noted, both contracts had the word "Insured" in the heading, and both indicated that Masters Touch had general liability and workers compensation insurance with Greeneville Insurance Agency. Further, the budget information in the contract included a $10,000 amount for workers compensation and liability insurance, thereby representing that Masters Touch would be incurring this expense as one of the costs of construction. Notwithstanding these representations, it appeared that the Debtor only paid the initial premium so that the required insurance would be in place when Masters Touch applied for renewal of its contractor license. *See* Tenn. Comp. R. & Regs. 0680-06-.02 (requiring

10

general contractor with a monetary limit of less than $500,000 to obtain general liability insurance of at least $100,000). Regarding the Debtor's knowledge of this falsity, Debra Justice, an employee of Greeneville Insurance Agency, testified that notice of cancellation of Masters Touch's workers compensation and general liability policies was given to it on September 5, 2008, with the cancellation effective September 25, 2008, and Masters Touch had no insurance policy with her company thereafter. As with licensure, materiality of the insurance requirement was established by the fact that the Plaintiffs raised it in their first conversation with the Debtor and by Ms. Lindsay's testimony that insurance was important to the Plaintiffs because it would protect them financially in the event someone was hurt while on the property during construction.

The second *Rembert* factor, intent to deceive, is measured by a subjective standard. *In re Rembert*, 141 F.3d at 281 (citing *Field v. Mans*, 516 U.S. 59, 70-72, 116 S. Ct. 437 (1995)). Intent to deceive a creditor exists "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." *In re Copeland*, 291 B.R. at 765-66 (quoting *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001)). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *In re Rembert*, 141 F.3d at 282 (quoting *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)). As stated in *Copeland*:

> A debtor's fraudulent intent "may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations."

*In re Copeland*, 291 B.R. at 766 (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).

In this case, after careful consideration of all of the evidence, the court concludes that the Debtor possessed the subjective intent to deceive the Plaintiffs regarding the status of Masters Touch's contractor license and insurance. From his first conversation with the Plaintiffs, the Debtor was informed that licensure and insurance would be requirements of the Plaintiffs' lender and thus

11

of any builder that they chose.  The Debtor indicated "no problem" to the requirements, without disclosing that Masters Touch's contractor license had only a $150,000 limit.  Moreover, the Debtor failed to disclose Masters Touch's 2007 tax lien and other tax liabilities when renewing Masters Touch's contractor license.  No explanation was given by the Debtor for this failure.  One can logically conclude that the Debtor omitted the information because he was concerned that Masters Touch's license would not be approved otherwise and he would lose Plaintiffs' business.

The Debtor argues that there was no intent to deceive.  He points to the fact that on October 8, 2008, after the execution of the second contract on October 2, 2008, he sent to the Plaintiffs and to Plaintiffs' lender Bank of America by facsimile a letter from the Tennessee State Board of Licensing Contractors dated October 7, 2008, verifying that he was licensed and stating "Monetary Limit: $150,000."  The Debtor introduced a confirmation receipt of the faxed letter to the bank, but not of the letter to the Plaintiffs, although he testified that he remembers receiving confirmation of the fax to the Plaintiffs.  Presumably, these faxes were in response to an email from Ms. Lindsay on October 3, 2008, wherein she stated that the bank was ready to close the construction loan and that "[v]erification of your license may be the last step."  Ms. Lindsay testified that she did not remember receiving the email, and that she did not believe that she ever saw a copy of Masters Touch's license, although she stated that she did recall discussing with the Debtor that he needed to verify his license with the bank.

Considering the totality of the evidence, this court rejects the assertion that the Debtor's faxing of the letter from the state board establishes that he did not have the intent to deceive the Plaintiffs.  As noted, it was clear from the Debtor's first conversation with the Plaintiffs that their bank would require proof of licensure before the project would be funded, and Ms. Lindsay's October 3, 2008 email reminded him that license verification was needed before their loan could close.  By forwarding the state board letter, the Debtor was merely meeting the bank's precondition for closing, rather than fully disclosing to the Plaintiffs the limitations of Masters Touch's contractor license.  Admittedly, the letter did include the words "Monetary Limit: $150,000."  However, the letter did not set forth an explanation as to what this meant and it also stated "License Status: Active – Fully Licensed."

Similarly, the Debtor's conduct regarding Masters Touch's insurance and corporate status

12

indicates an intent to deceive.  The Debtor had advised the Plaintiffs that providing proof of insurance would be no problem.  Yet at the time of this statement, Masters Touch had no general liability or workers compensation insurance, and in fact none from February 2, 2008, to June 25, 2008, even though according to the Debtor's own testimony he was building two other houses at the time.  He then obtained insurance just long enough for Masters Touch to renew its contractor's license so proof of licensure and insurance could be provided to Plaintiffs' lender.  In this same vein, the Debtor continued to hold himself out as operating under the corporate entity Masters Touch, even though the corporation was administratively dissolved from 2004 to 2008, with efforts to reinstate the corporate status only made in contemplation of Plaintiffs' contract.

The court turns next to the third *Rembert* factor, justifiable reliance by the creditor, which is also a subjective standard, requiring a showing that the creditor actually relied on the misrepresentation and that the reliance was justifiable.  *See In re Copeland*, 291 B.R. at 766-67; *see also Field v. Man*s, 516 U.S. at 74-75 (holding that justifiable reliance does not entail reasonable reliance).  "Under this standard, a creditor will be found to have justifiably relied on a representation even though 'he might have ascertained the falsity of the representation had he made an investigation.'"  *In re Copeland*, 291 B.R. at 767 (quoting *Comm. Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)).

Actual reliance was established by Ms. Lindsay's testimony that the Plaintiffs would not have entered into the contract had they known Masters Touch was not adequately licensed and insured.  *See, e.g.*, *Bottari v. Baiata (In re Baiata)*, 12 B.R. 813, 820 (Bankr. E.D.N.Y. 1981) (addressing 11 U.S.C. § 523(a)(2)(A) claim in the context of an unlicensed contractor, and noting that "[t]he incidence of license conveys to lay persons a concept of authority and standards of workmanship impacting on reliance").  Further, the Plaintiffs' reliance was justifiable, despite the fact that they may have received the October 8, 2008 fax from the Debtor.  While the fax did include the words "Monetary Limit: $150,000" in the body of the letter, absent an explanation as to what these words meant a nonprofessional might easily overlook them in light of the more readily understandable phrase in the letter, "License Status: Active – Fully Licensed."  Also, receipt of this letter, and what it did and did not say, must be considered in light of the time frame in which it was sent and the previous communications between the Debtor and the Plaintiffs.  As Ms. Lindsey's

13

email indicated,  verification of licensure was the last step in the loan closing process, after the
Plaintiffs had already signed two different contracts with Masters Touch, changed architectural
plans, and successfully responded to the bank's draw schedule changes, all without any indication
from the Debtor that there was any problem either with Masters Touch's contractor license or
insurance.  The Plaintiffs' failure, in this last step of the preconstruction process, to fully
comprehend and investigate the oblique reference to the words "Monetary Limit" in an otherwise
insignificant administrative letter does not negate the justifiability of their reliance.

The fourth and last element of the *Rembert* requirements is that the creditor's reliance on the
debtor's misrepresentations must have been the proximate cause of the loss sustained by the creditor.
*In re Rembert*, 141 F.3d at 280-81.  "Proximate cause requires both causation in fact (but-for
causation) and legal causation."  *Wilcox v. Carpenter (In re Carpenter)*, 453 B.R. 1, 7 (Bankr.
D.D.C. 2011).  As to the former, "[c]ausation in fact can be established through evidence
demonstrating that the debtor's false statements induced the creditor to enter into an agreement with
the debtor for his services and that the misrepresentation was a substantial factor in influencing the
creditor's decision."  *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 219 (B.A.P. 1st Cir.
2002).  With respect to legal causation:

> "misrepresentation is a legal cause only of those pecuniary losses that are within the
> foreseeable risk of harm that it creates.  This means that the matter misrepresented
> must be considered in the light of its tendency to cause those losses and the
> likelihood that they will follow."  Restatement [(Second) of Torts §] 548A cmt. a and
> b.  Legal causation can be established through evidence showing that the creditor's
> loss could reasonably have been expected to result from its reliance on the debtor's
> misrepresentation.

*In re Carpenter*, 453 B.R. at 7-8 (citing *In re Creta*, 271 B.R. at 221).

In the present case, causation in fact was clearly established.  The evidence demonstrated that
the Plaintiffs would not have entered into the contract had they known Masters Touch was not
adequately licensed and insured.  This evidence was credible; the Plaintiffs were from out-of-town,
out-of-state in fact, and would be building a house from a distance of several hundred miles away.
It is only logical that they would want a contractor who had been approved by the proper
government authorities to perform the job for which they were contracting, and that insurance was
in place to protect from any possible claims against them.

14

On the other hand, the evidence did not establish legal causation as to the insurance misrepresentation. The foreseeable loss from an absence of liability insurance is that someone would be harmed during the construction and would seek recovery from the Plaintiffs. It was not foreseeable from a false insurance representation that the Plaintiffs would be harmed by defective construction. *See id.* at 12-13 (misrepresentation that contractor was insured was not legal causation of damages for defective work sustained by plaintiff where insurance was not designed to cover such losses).

Misrepresentations regarding licensure, however, did demonstrate legal causation. As stated by the First Circuit's Bankruptcy Appellate Panel, "[a] misrepresentation as to whether a debtor has such a license goes to the very essence of the agreement, i.e., the reliance by the contracting party that the debtor has the requisite knowledge, experience, and training to properly complete the work." *In re Creta*, 271 B.R. 220 (citations omitted); *see also Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 898 (Bankr. E.D. Va. 1999) ("Professional licenses carry with them a degree of presumed competence . . . ."); *Vaks v. Grenier (In re Grenier)*, No. 07-1131, 2009 WL 763352, *9 (Bankr. D. Mass. Mar. 19, 2009) ("A misrepresentation that a contractor has a license when in fact the contractor does not may form the basis of an exception to discharge under § 523(a)(2)(A) where the creditor would not have hired the contractor had he or she known the contractor was unlicensed, where the creditor justifiably relied on the representation, and where the creditor sustained damage from the contractor's fraud and substandard work.").

The evidence in this case established that the defective work sustained by the Plaintiffs would have been far less likely to have occurred with a contractor with greater knowledge and experience. Mr. Corum, the structural engineer, noted that a lot of issues were missed by the Debtor during construction and that the Plaintiffs' steep lot required a different foundation than the one used by Masters Touch. Mr. Corum attributed the construction problems to the Debtor's lack of experience, poor workmanship, and a lack of oversight, problems that could have been avoided if a contractor with the right credentials had been used.

Similar conclusions pertain to a contractor holding a license without adequate monetary limits. As noted by this court in its earlier opinion on summary judgment, "[t]he purpose of a monetary limitation, of course, is to afford financial security to owners, vendors and others dealing

15

with a contractor." *Helton v. Angelopoulos*, 629 S.W.2d 15, 18 (Tenn. 1982). A 1993 Tennessee Attorney General Opinion explains that in determining the monetary limitations to be placed on a license, "the Board is to consider the applicant's years of experience and a given multiple of the applicant's net worth or his working capital." Tenn. Op. Atty. Gen. No. 93-12, 1993 WL 349725, *3 (Feb 11, 1993) (citing Tenn. Comp. R. & Regs. 0680-1.13(1)). While the current rules regarding monetary limitations do not specifically state that an "applicant's years of experience" are to be considered in determining an applicant's monetary limit, *see* Tenn. Comp. R. & Regs. 0680-01-.13 (setting forth the formula by which monetary limits are placed on a contractor license classification, such limits being tied to the applicant's net worth or working capital), the Tennessee Supreme Court has observed that the underlying purpose of the licensing statutes is "to safeguard life, health, and property, and to promote public welfare by requiring that only properly qualified persons shall be engaged in general contracting." *Farmer v. Farmer*, 528 S.W.2d 539, 542 n.1 (Tenn. 1975) (quoting historical language of the Tennessee statutes and concluding that the intent of the historical language was "implicit in those portions of the statute that do remain"). Because a contractor's monetary limits is tied to its net worth, had Masters Touch obtained the requisite monetary limits to build Plaintiffs' house, it is foreseeable that its net worth would have been sufficient to remedy the defective construction. In conclusion, because all of the elements of nondischargeability under the *Rembert* standard have been established, the Debtor's obligation to the Plaintiffs will be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

III.

The court having made a determination of nondischargeability, the next logical question is what is the amount of the Debtor's obligation to the Plaintiffs, i.e., what are their damages? Under Tennessee law:

> the measure of damages is the cost of correcting the defects or completing the omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value

16

> between the work if it had been performed in accordance with the contract and that
> which was actually done, or (as it sometimes said) the difference between the value
> of the defective structure and that of the structure if properly completed.    13
> Am.Jr.2nd, pp. 79, 80, 81 Section 79.

*Edenfield v. Woodlawn Manor, Inc*., 462 S.W.2d 237, 241 (Tenn. 1970); *see also GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 543 (Tenn. App. 2005) ("[I]n the event that the cost of repairs is disproportionate when compared with the difference in value of the structure actually constructed and the one contracted for, the diminution value may be used instead as the measure of damages.").[3]

Applying this standard to the case at hand, Mr. Corum testified that the cost to repair the foundation alone would range from $75,000 to $150,000, such that the repair cost would be greater than what the structure was worth.    It was his conclusion and that of contractor Amos Halava that the defects in construction were so severe that the entire structure should be demolished.  The court found both witnesses and their conclusions to be credible.  The Debtor disputed this testimony, but offered no alternative estimation of the cost of repair or diminution of value, even though he conceded that the framing required some reinforcements.  *See GSB Contractors, Inc. v. Hess*, 179 S.W.3d at 543 ("burden is on the defendant to show that the cost of repair is unreasonable when compared to the diminution in value due to the defects and omissions").

As stipulated by the parties in their joint pretrial statement, the total sum paid by the Plaintiffs to Masters Touch and retained by it was $157,420.71.  Moreover, Ms. Lindsay testified that the Plaintiffs spent approximately $22,000 on outstanding bills not paid by Masters Touch, after they terminated its services, for total expenditures of $179,420.71 in connection with the project.[4]

---

[3] The measure of damages described is the standard for defects or omissions in the performance of a construction contract.  In an action for damages caused by a fraudulent misrepresentation, "the proper measure of the plaintiffs' general damages is the benefit of the bargain rule."  *Elchlepp v. Hatfield*, 294 S.W.3d 146, 151 (Tenn. App. 2008) (quoting *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 233 (Tenn. App. 1976)).  "This measure of damages allows the plaintiff to recover the difference between the actual value of the property he received at the time of the making of the contract and the value that the property would have possessed if the defendant's representation had been true." *Id.*  In this court's view, both measurements lead to the same result when applied to the facts of the instant case.

[4] While the "approximately $22,000" spent by the Plaintiffs suffers from inexactitude, these damages were not challenged by the Debtor.

Accordingly, the partial structure that was built by Masters Touch should have had a value of this amount. Because the structure has no value due to its defective construction, the diminution in value is the amount paid, $179,420.71, and, consequently, that is the amount of the Plaintiffs' damages.[5]

In their complaint and at trial, the Plaintiffs sought and maintained that they are entitled to a judgment for $342,700, the full contract amount. However, no authority was advanced for this proposition. And, to the contrary, the law does not support an award for the total contract price since the Plaintiffs did not pay Masters Touch this amount. *See* John B. Ludington, Annotation, *Modern Status of Rule as to Whether Cost of Correction or Difference in Value of Structures is Proper Measure of Damages for Breach of Construction Contract,* 41 A.L.R.4th 131, § 15 (1985) ("the measure of an owner's damages for a construction contractor's breach is the cost of completing the contract or correcting the defective work, minus the unpaid part of the contract price"); *Rafferzeder v. Zellner*, 613 S.E.2d 229, 231 (Ga. App. 2005) (trial court erred in failing to deduct from homeowner's damages the amount saved by not paying the contractor the full amount of the contract price); 6 *Bruner & O'Connor on Construction Law* § 19:56 (2011) (damage measure is the reasonable cost to complete the contract in conformance with its terms less unpaid contract funds).[6]

The Debtor's primary objection as to damages is that the Plaintiffs have not completed the house, and that, as a result, it has suffered water and other damage after exposure to the elements because the house is not completely under roof. In effect, the Debtor's argument is that the Plaintiffs have failed to mitigate their damages as they are obligated to do. *See Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 234 (Tenn. App. 1976) ("It is the duty of an injured party to exercise

---

[5] In addition to damages associated with diminution in value or cost of repairs, a plaintiff may also recover any reasonably foreseeable consequential and incidental damages. *Campbell v. Teague*, No. W2009-00529-COA-R3-CV, 2010 WL 1240732, *13 (Tenn. App. March 31, 2010) (citing, *inter alia*, *Holladay v. Speed*, 208 S.W.3d 408, 415 (Tenn. App. 2005) and *Mills v. Brown*, 568 S.W.2d 100, 103 (Tenn. 1978)). Other than the $22,000 amount, no evidence of any such damages was introduced in the present case.

[6] Although the measure of damages is expressed somewhat differently in these authorities, again the amount of damages remains the same. The contract between the parties provided that the price set forth therein was an estimate, and that the homeowner would be charged the actual amount of construction. If the contract estimate of $342,700 were reduced by the contract balance that the Plaintiffs did not pay Masters Touch, the amount of damages would again be $179,420.71 ($342,700 - x = $179,420.71 with x being the contract amount not paid).

reasonable care and diligence to avoid loss or minimize damages."). The evidence did establish that the exterior logs and some of the interior wood walls and floors have sustained water and moisture damage because of exposure. However, Mr. Corum testified that this damage was not the basis of his recommendation that the entire building be scrapped. Rather, his recommendation was based on the structural unsoundness of the foundation and of the framing that was unrelated to the water damage. Accordingly, any suggestion that the Plaintiffs' damages should be reduced because of their conduct is unsupported by the evidence.

As noted, the Plaintiffs not only seek compensatory damages, but also treble damages, costs, and attorney's fees pursuant to the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an ascertainable loss. Tenn. Code Ann. § 47-18-109(a)(1). Upon a finding that a provision of the TCPA has been violated, the court may award reasonable attorney's fees and costs. Tenn. Code Ann. § 47-18-109(e)(1). Moreover, if the defendant's conduct was willful or knowing, the court may award treble damages. Tenn. Code Ann. § 47-18-109(a)(3). All such damages are excepted from discharge under 11 U.S.C. § 523(a)(2)(A). *See Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S. Ct. 1212 (1998).

The court concludes that a violation of the TCPA has been established. Under Tenn. Code Ann. § 62-6-136(a), '[i]t is unlawful for any person or corporation to represent itself as a licensed contractor or to act in the capacity of a 'contractor'" unless such person or corporation has been "duly licensed" under Tenn. Code Ann. § 62-6-103. *See also* Tenn. Code Ann. § 62-6-103(a)(1) (similarly stating that is lawful "to engage in, or offer to engage in, contracting" unless duly licensed). A violation of this provision constitutes an unfair or deceptive act or practice under the TCPA. *See* Tenn. Code Ann. §§ 62-6-136(b) and 47-18-104(b)(35). In other words, a contractor who holds itself out as a properly licensed contractor who is not properly licensed commits a *per se* violation of the TCPA. *Campbell v. Teague*, 2010 WL 1240732, *13. Although Masters Touch renewed its contractor's license before commencing the Plaintiffs' construction, it never held a contractor's license with monetary limits sufficient to build a house in the contract amount. Thus, Masters Touch was never properly or "duly licensed" in connection with the Plaintiffs' construction

19

contract. *See Campbell v. Teague*, 2010 WL 1240732, *8 (holding that contractor with a monetary limit of $200,000 that contracted to build a $240,500 house was not properly licensed and violated TCPA); Tenn. Comp. R & Regs. 0680-01-.13(4) ("no contractor shall engage, or offer to engage, in any project of which the cost . . . would exceed the monetary limitation placed on his license"). Further, Tennessee law imposes liability in this regard not only on the contractor, i.e. Masters Touch, but also the Debtor as the individual making the misrepresentations on behalf of his company. *See* Tenn. Code Ann. § 62-6-136(c) ("An individual who violates this section and would, but for this section, have limited liability as owner of an entity having limited liability protection, including, but not limited to, a corporation, is personally liable for the individual's own representations, acts or omissions to the same extent as if that individual rendered the representations, acts or omissions as an individual.").

In light of this violation, the court concludes that an award of reasonable attorney's fees and costs is appropriate. "The potential award of attorney's fees under the Tennessee Consumer Protection Act is intended to make prosecution of such claims economically viable to plaintiff." *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005). TCPA "was passed, in part, to protect consumers from unfair and deceptive acts and practices occurring 'in the conduct of any trade or commerce' in the state and to provide a means 'for maintaining ethical standards of dealing between persons engaged in business and the consuming public.'" *Fayne v. Vincent*, 301 S.W.3d 162, 172 (quoting Tenn. Code Ann. § 47-18-102(2) and (4)). "The Act is to be liberally construed in order to enable it to protect the consumer and to promote the other policies that motivated its passage." *Campbell v. Teague*, 2010 WL 1240732, *5 (citing, *inter alia*, Tenn. Code Ann. §§ 47-18-102 and 115). Although no evidence was offered at trial regarding the attorney's fees and costs incurred by the Plaintiffs, they reserved their right to supplement the record on this issue in the event the court granted judgment in their favor. Accordingly, counsel for the Plaintiffs will be permitted to file an affidavit setting forth the requested fees and costs.

With respect to the Plaintiffs' request for treble damages, as previously noted, under Tenn. Code Ann. § 47-18-109(a)(3), "[i]f the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary

20

and proper." In determining whether treble damages should be awarded, the court may consider the following: "(A) The competence of the consumer or other person; (B) The nature of the deception or coercion practiced upon the consumer or other person; (C) The damage to the consumer or other person; and (D) The good faith of the person found to have violated the provisions of this part." Tenn. Code Ann. § 47-18-109(a)(4). While the Debtor knew that Masters Touch was not properly licensed to build the Plaintiffs' house, having twice unsuccessfully sought an increase of its monetary limits, the court does not find that this is an appropriate case for an award of treble damages. There is no indication that the Debtor intended the damages sustained by the Plaintiffs. He had built houses of that size before, apparently successfully, as demonstrated by the $700,000 house that was shown to the Plaintiffs. Further, there is no indication that the Debtor did not intend to complete the Plaintiffs' house to the best of his abilities. During the construction, the Debtor suffered health problems and encountered weather issues, as well as employee turnover, that caused construction delay. While these circumstances are insufficient to excuse the Debtor's fraudulent misrepresentations, they do suggest some indication of good faith on the part of the Debtor.

IV.

For the foregoing reasons, an order will be entered granting the Plaintiffs a nondischargeable judgment against the Debtor in the amount of $179,420.71 plus attorney's fees and costs.

# # #

21